## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **RAMON JUILIANO,** ) | |
| ) | |
| **Petitioner,** ) | |
| ) | |
| **v.** ) | **No. 04-3166-KHV** |
| ) | |
| **LOUIS E. BRUCE, et al.,** ) | |
| ) | |
| **Respondents.** ) | |
| ————————————————————————— ) | |

## MEMORANDUM AND ORDER

On November 26, 1997, the District Court of Wyandotte County, Kansas, convicted Ramon Juiliano of first degree murder and solicitation to commit first degree murder. Pursuant to 28 U.S.C. § 2254, plaintiff, *pro se*, seeks a writ of habeas corpus. For reasons stated below, the Court denies the petition.

**I.     Procedural Background**

On June 13, 1997, in the District Court of Wyandotte County, Kansas, the district attorney charged Juiliano with solicitation to commit first degree murder in violation of K.S.A. § 21-3301, theft in violation of K.S.A. § 21-3701 and first degree murder in violation of K.S.A. § 21-3401. See Information in No. 97 CR 1188. On July 22, 1997, the district attorney amended the charge to first degree murder in violation of K.S.A. § 21-3401, solicitation to commit first degree murder in violation of K.S.A. § 21-3303, arson in violation of K.S.A. § 21-3718 and two counts of theft in violation of K.S.A. § 21-3701. See Amended Information in No. 97 CR 1188. On November 17, 1997, Juiliano entered a plea of guilty as to arson and one count of theft. Petition To Enter Plea Of Guilty in No. 97 CR 1188. The court dismissed the second theft charge prior to the start of the trial. See Transcript of Jury Trial ("Tr.") at 215.

On November 26, 1997, a jury found Juiliano guilty of first degree murder and solicitation to commit murder. Record, 2:192. On December 2, 1997, Juiliano filed a motion for a new trial. On January 14, 1998, the district court denied the motion. On February 23, 1998, the district court sentenced Juiliano to life in prison (Hard 40 sentence) for murder, 49 additional months for solicitation, 12 months for arson and six months for theft. Record, 2:202-04. The sentences for solicitation, arson and theft run concurrently with each other but consecutively to the murder count. Id.

Juiliano appealed his conviction to the Kansas Supreme Court, arguing that (1) the trial court erred in allowing the direct examination of the firearms examiner's testimony to be read back to the jury without also allowing a read-back of cross-examination on the same points; (2) the trial court abused its discretion in failing to dismiss the charge of criminal solicitation to commit first degree murder; and (3) the record did not contain sufficient competent evidence of first degree murder and solicitation to commit first degree murder. See Brief of Appellant, State v. Juiliano, 268 Kan. 89, 991 P.2d 408 (1999) (No. 98-80742-S). On November 5, 1999, the Kansas Supreme Court affirmed, finding that the trial court did not err in providing the read-back solely from direct examination or denying Juiliano's motion for acquittal and that the record contained sufficient evidence from which a reasonable mind could conclude that the defendant was guilty beyond a reasonable doubt of criminal solicitation to commit murder and first degree murder. See State v. Juiliano, 268 Kan. 89, 991 P.2d 408 (1999).

On March 30, 2002, Juiliano filed a state motion for post-conviction relief under K.S.A. § 60-1507. There, he asserted ineffective assistance of counsel, specifically stating that (1) trial counsel failed to file a motion to quash Juiliano's arrest and suppress any evidence obtained as a result of the arrest; (2) trial counsel failed to object to the prosecution's introduction of "good character" evidence on behalf of

2

the deceased; (3) trial counsel failed to object to prosecutorial misconduct at trial; and (4) cumulative errors of defense and appellate counsel rendered their assistance ineffective. See Motion For Relief Pursuant To K.S.A. 60-1507 filed April 9, 2002 in No. 02C1472. On September 27, 2002, the district court conducted a hearing and denied relief. Transcript of 60-1507 Motion filed December 30, 2002 in No. 02C1472. Juiliano appealed to the Kansas Court of Appeals, again asserting ineffective assistance. Specifically, Juiliano claimed that (1) trial counsel failed to file a motion to quash Juiliano's arrest and suppress evidence obtained as a result of the arrest; (2) trial counsel failed to object to the introduction of "good character" evidence on behalf of the deceased; (3) trial counsel failed to object to prosecutorial misconduct at trial; (4) appellate counsel failed to raise the issue of prosecutorial misconduct on appeal; and (5) cumulative errors of defense and appellate counsel rendered their assistance ineffective. See Brief of Appellant, Juiliano v. State, 82 P.3d 875 (Kan. App. 2004) (No. 02-89795-A). On December 24, 2003, the Kansas Court of Appeals affirmed the denial of post-conviction relief. On March 31, 2004, the Kansas Supreme Court denied Juiliano's petition for review.

On May 24, 2004, Juiliano filed a *pro se* petition for writ of habeas corpus in this Court, asserting ineffective assistance of counsel. Specifically, Juiliano argues that (1) trial counsel failed to conduct pretrial investigation and question state witnesses; (2) trial counsel failed to file a motion to quash the arrest warrant and suppress evidence taken as a result of the unlawful arrest; (3) trial counsel failed to object to admission of "good character" evidence of the victim; (4) trial counsel failed to object to prosecutorial misconduct; (5) trial counsel failed to object to and attempt to suppress admission of the murder weapon into evidence; (6) trial counsel failed to object to judicial misconduct of the trial judge when the judge failed to give an alibi instruction; and (7) defense and appellate counsel failed to raise the issue of prosecutorial misconduct at

3

trial and on appeal.  See Petition For A Writ Of Habeas Corpus Pursuant To 28 U.S.C. § 2254 (Doc. #1) filed in No. 04-3166-KHV.

**II.    Evidence And Arguments At Trial**

Michelle Jardon had been married since June of 1988.  In 1993, Juiliano began having an affair with Jardon.  Jardon attempted to break off the relationship sometime in 1996 but remained in regular telephone contact with Juiliano.[1]  Id. at 971, 975.  In January of 1997, Jardon began another affair with Jack West.  Juiliano became depressed and told others that he would like to kill West but that he did not have the nerve to do so.  West was not aware of the previous relationship between Jardon and Juiliano. Id. at 293, 329, 982.

At 11:30 p.m. on February 19, 1997, police responded to a call about a man walking through the streets several blocks from West's home.  Id. at 488.  Police found Juiliano in the area.  Id. at 489. Juiliano told the officers that he was "walking off steam" because he was angry over a relationship and that he lived in the area.  Id. at 490.  Sometime later, the officers again encountered Juiliano in a church parking lot, two blocks from where they had spoken with him.  Id. at 491.  The officers asked Juiliano for identification and told him to go home.  Id. at 494.  At 2:09 a.m., a different officer talked with Juiliano as he sat in a rental car in the church parking lot.  Id. at 572.  Juiliano admitted that he was watching West's townhouse because he thought his girlfriend was there.  Id. at 574.

On several occasions after Jardon broke up with him, Juiliano told different friends that he would like to kill West but that he lacked the nerve to do it.  Id. at 1124, 1127, 1179, 1190.  In April of 1997,

---

[1]    Jardon did not remember when she broke off the relationship.  Prosecution offered evidence that as late as November of 1996 she sent him a card.

4

Juiliano asked Charles Chaney to come to his home to do some repair work.  Id. at 881.  When Chaney arrived, Juiliano questioned, "I just want to know if you know anybody or you'll kill somebody for me." Id. at 883.  Juiliano indicated that the person he wanted to kill was his girlfriend's boyfriend.  Id.  Chaney refused.  Id. at 884.  Chaney testified that Juiliano was serious about finding someone to kill the boyfriend but that Chaney did not take him seriously.  Id. at 886.  Juiliano testified that he did not intend for Chaney to kill anyone and that he was just having a bad day.  Id. at 1578-79.

On May 22, 1997, a masked man dressed in camouflage confronted West as he turned onto his street as he came home from work.  Id. at 294.  West saw the man emerge from a wooded area, kneel down in a firing position in the street and point a handgun at West's vehicle.  Id.  West reported the incident to police.  Id. at 296.  He also called Jardon, who reported that her husband was at home.  Id.

Juiliano testified that on June 4 or 5, 1997, a co-worker brought a Ford Aerostar van to his property.  Id. at 1582.  Juiliano hid the van in his barn until he could remove the seats.  Id. at 1581. Juiliano testified that he was instructed to set the van on fire.  Id. at 1582.  On June 6, 1997, the van owner reported it as stolen and told police that he had left it unlocked at a shopping mall with the ignition running. Id. at 789-93.

On June 11, 1997, Jardon celebrated her parents' wedding anniversary with family members while her husband hauled hay.  Id. at 1004-05.  Jardon took her grandmother home and called Juiliano at approximately 10:30 p.m., on her way home.  Id. at 1007.  Around 10:40 p.m., she arrived home where her husband was eating dinner.  Id. at 1009.  Her husband went to bed while she stayed up.  Id.  Jardon called West at approximately 11:15 p.m., as he left work, and talked until he pulled into the driveway of his townhouse and turned off the ignition.  Id.

At approximately 11:30 p.m., West's mother, Linda West, and his stepfather, Dan Pratt, waited in the living room for West to arrive home from work. Id. at 307. They heard a noise outside the front door and then heard West's body hit the front door. Id. Pratt heard two shots, a pause, and two more shots. Id. at 334. Pratt tried to open the door but could not get the deadbolt to release immediately due to the pressure of West's body against the door. Id. at 335. When Pratt got the door open, West fell face-first into the doorway. Id. Pratt stepped outside and noticed smoke within several feet of the front step, but he did not see anyone. Id. at 336. He called 911 at 11:37 p.m. Id. at 260. West died as his mother talked to him, apparently never re-gaining consciousness. Id. at 310.

Police recovered four bullet fragments from the porch and door, id. at 594, but found no shells at the scene. Id. at 486. West's wallet contained $108. Keys, a cellular phone, and West's checkbook remained in his car. Id. at 840, 1390.

During an autopsy, the coroner removed eight bullet fragments from four bullets from West's body. Id. at 811. West sustained gunshot wounds to his head, right arm, left shoulder and side. Id. at 811-15. West died from the gunshot wound to his side. Id. at 16.

At 12:05 a.m. on June 12, 1997, Juiliano called 911 to report that a vehicle had driven into a barn on his property and that the barn had started on fire.[2] Id. at 264. The first officer on the scene noted that flames engulfed the barn and a Ford Aerostar van inside. Id. at 622. The officer also noted evidence that the van had been intentionally parked in the barn. Id. at 630. Police returned to Juiliano's home between 4:30 a.m. and 5:30 a.m. that morning and transported him to the station for questioning. Id. at 1100.

---

[2]      Police found that the drive between West's townhouse and Juiliano's property takes approximately 17 minutes when observing all traffic regulations. Id. at 1262.

Juiliano consented to a search of the property.  Id. at 1103.  During the search, police found various firearms, ammunition and spent shell casings.  Id. at 738.  Inside Juiliano's vehicle, police found binoculars, a police scanner pre-set to the Kansas City, Kansas Police Department radio frequency, a pair of working gloves, and Juiliano's wallet.  Id. at 673-74, 935.  Inside the barn where Juiliano parked his Blazer, officers found gasoline cans and seats from the Ford Aerostar van.

On June 16, 1997, a gun-sniffing dog found a plastic grocery sack on Juiliano's property which contained a 1997 Smith & Wesson, Model 66, .357 Magnum revolver in a shoulder holster.  Id. at 710, 850, 1068.  The dog found the gun approximately 176 feet from the burned barn.  Id. at 911.  The revolver held two live and four spent Midway brand rounds.  A firearms examiner determined that the .357 Magnum had fired the bullets into West's body.  Id. at 1482.  The shell casings found in the weapon and those found in Juiliano's home also came from the .357 Magnum.  Id. at 1481-82.

One of Juiliano's co-workers testified that he had sold a .357 Magnum and holster to Juiliano and that the gun he had sold was the gun found on Juiliano's property.  Another co-worker testified that he saw Juiliano with a .357 Magnum two months before the murder, although the gun he saw had wood grips rather than plastic grips.  Juiliano testified that he bought a .357 Magnum but that he had sold the gun in May of 1997 to pay child support.  Id. at 1609-10.  He denied owning the shoulder holster.  Id. at 1626.

During closing arguments, the prosecutor told the jury that Juiliano "stalked the West residence" and "was stalking Jack West."  Id. at 1694.  She referred to the man who emerged from the woods near West's home on May 22 as a stalker.  Id. at 1696.  She also referred to items found in Juiliano's vehicles as evidence used to stalk the victim.  Id. at 1702.  The prosecutor told the jury that Juiliano "lied to the 911 operator.  He lied to his neighbors.  He lied to fire fighters.  He lied to police officers and later to

7

detectives." Id. at 1697.  Regarding the testimony of Juiliano's friends and co-workers, the prosecutor

posed the question, "Are they all lying?  Are each and every one of them lying to you or is Tony Juiliano

the liar?" Id. at 1730.  She summarized defense counsel's closing argument by stating that "he's blown a

lot of smoke" and she encouraged the jury to "hold this killer accountable." Id. at 1725, 1704.

**III**.    **Legal Standards**

The Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub. L 104-32, 110 Stat. 1214

(1996) (codified in relevant part at 28 U.S.C. § 2254), governs the Court's review in this case.  See

Paxton v. Ward, 199 F.3d 1197, 1204 (10th Cir. 1999) (AEDPA applies to habeas petitions filed after

April 24, 1996, regardless of date of criminal trial forming basis of conviction).  Under Section 2254, as

amended by AEDPA, the Court may not issue a writ of habeas corpus with respect to any claim which the

state court adjudicated on the merits unless that adjudication resulted in a decision:

> (1) . . . that was contrary to, or involved an unreasonable application of, clearly established
> Federal law, as determined by the Supreme Court of the United States; or
> (2)  .  .  .  that was based on an unreasonable determination of the facts in light of the
> evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).  The Court may issue a writ of habeas corpus under the "contrary to" clause

only if (1) the state court arrived at a conclusion opposite to that reached by the United States Supreme

Court on a question of law, or (2) the state court decided a case differently than the Supreme Court on a

set of materially indistinguishable facts.  Williams v. Taylor, 529 U.S. 362, 405-06 (2000).  Under the

"unreasonable application" clause, the Court may grant habeas relief if the state court "correctly identifies

the governing legal rule but applies it unreasonably to the facts of a prisoner's case." Id. at 407-08.  The

Court may not issue a writ simply because it concludes in its independent judgment that the state court

applied clearly established federal law erroneously or incorrectly; the application must have been objectively unreasonable. Id. at 409-11.

**IV**.   **Analysis**

Juiliano raises seven ineffective assistance issues in his habeas petition: (1) trial counsel failed to conduct pretrial investigation and question state witnesses; (2) trial counsel failed to file a motion to quash the arrest warrant and suppress evidence taken as a result of the unlawful arrest; (3) trial counsel failed to object to admission of "good character" evidence of the victim; (4) trial counsel failed to object to prosecutorial misconduct; (5) trial counsel failed to object to and attempt to suppress admission of the murder weapon into evidence; (6) trial counsel failed to object to judicial misconduct of the trial judge when the judge failed to give an alibi instruction; and (7) defense and appellate counsel failed to raise the issue of prosecutorial misconduct at trial and on appeal.

**A.**   **Pretrial Investigation; Evidence Of Murder Weapon; Judicial Misconduct**

Juiliano raises three ineffective assistance arguments for the first time in this habeas petition: (1) trial counsel did not thoroughly investigate the case before trial and failed to interview state witnesses; (2) trial counsel failed to object to and attempt to suppress admission of the murder weapon into evidence; and (3) trial counsel failed to object to judicial misconduct of the trial judge when the judge failed to give an alibi instruction.

A state prisoner cannot petition for federal habeas corpus relief "unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). The exhaustion requirement is satisfied if the federal issue has been properly presented to the highest state court, either by direct review of the conviction or in a postconviction attack. Dever v. Kan. State

Penitentiary, 36 F.3d 1531, 1534 (10th Cir. 1994).  The procedural default doctrine precludes federal habeas review of a claim that a state court has declined to consider due to petitioner's noncompliance with state procedural rules unless the petitioner can show (1) both cause and prejudice or (2) manifest injustice. Coleman v. Thompson, 501 U.S. 722, 749 (1991).  In Coleman, the Supreme Court held that if "the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred[,]" petitioner's claims are procedurally defaulted "for purposes of federal habeas regardless of the decision of the last state court to which petitioner actually presented his claims." 501 U.S. at 735 n.1; see also Dulin v. Cook, 957 F.2d 758, 759 (10th Cir. 1992) (failure to properly present claims in state court constitutes procedural default for purposes of federal habeas review).

Here, Juiliano never presented these specific ineffective assistance claims to the state court  and it has not had a fair opportunity to act on his claims.[3]  See O'Sullivan v. Boerckel, 526 U.S. 838, 844 (1999).  A return to state court, however, would be futile because the time for appeal has passed. Therefore Juliano's claims are procedurally defaulted for purposes of federal habeas corpus review.  See Watson v. New Mexico, 45 F.3d 385, 387 (10th Cir. 1995).  Because Juiliano defaulted his claims, the Court cannot hear them unless he can show cause and prejudice or manifest injustice.

To show cause for the default, Juiliano must demonstrate that an objective, external impediment prevented him from raising the claim. Murray v. Carrier, 477 U.S. 478, 488 (1986).  "The mere fact that

---

[3]      In his petition, Juiliano states that he raised on direct appeal his ineffective assistance claim based on trial counsel's failure to object to admission of the murder weapon.  Even broadly construing Juiliano's claims, the Court cannot find evidence that he raised this claim.  See Juiliano, 268 Kan. 89, 991 P.2d 408; Brief of Appellant, Juiliano, 268 Kan. 89, 991 P.2d 408 (No. 98-80742-S).

counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default." Id. at 486. Juiliano maintains that he did not know what legal issues should have been raised on appeal and that counsel did not confer with him in determining which issues to raise. Juiliano's failure to recognize potential claims does not constitute cause.

In addition, Juiliano does not show that a miscarriage of justice may result if the Court does not hear his claims. To make this showing, petitioner must demonstrate that a constitutional error has probably resulted in the conviction of one who is actually innocent. See Bousley v. United States, 523 U.S. 614, 623 (1998). Juiliano offers no evidence that but for counsel's alleged errors, he would not have been found guilty. See Strickland v. Washington, 466 U.S. 668, 694 (1984). Because Juiliano cannot show cause and prejudice or a miscarriage of justice, the Court cannot hear his claims.

**B.    Motion To Quash Arrest**

Juiliano next argues that trial counsel failed to file a motion to quash the arrest warrant and suppress evidence taken as a result of the arrest.[4] Juiliano first raised this issue in his state habeas appeal. The Kansas Court of Appeals affirmed the denial of state habeas relief on this claim. In deciding whether counsel provided ineffective assistance, the court applied the following two-prong test: (1) whether counsel's performance fell below the standard of reasonableness; and (2) whether a reasonable probability existed that but for counsel's unprofessional errors, the result of the proceeding would have been different.

---

[4]    Juiliano's habeas petition does not specify which evidence he believes should have been suppressed. In Juiliano's appeal to the Kansas Court of Appeals, he expressly objected to the admission of photograph albums and a stash of weapons.

11

See Juiliano, 82 P.3d 875, 2004 WL 117319, at *1 (Kan. App. Jan. 23, 2004). The court noted the strong presumption that counsel's conduct fell within the range of reasonable professional assistance and that it had to consider the totality of the evidence. Id. The Kansas Court of Appeals decided the merits of Juiliano's claim under correct federal legal standards. See Strickland, 466 U.S. at 687. The Kansas Supreme Court denied Juiliano's petition for review. Juiliano has therefore exhausted his state court remedies on this claim, and this Court must determine whether the Kansas Court of Appeals unreasonably applied federal legal standards.

After examining the totality of evidence presented at trial, the Kansas Court of Appeals determined that it did not need to examine probable cause for the arrest because the evidence obtained after the arrest was "merely cumulative of other trial testimony and evidence." Id. The court remained unconvinced that the trial outcome would have differed had the court suppressed evidence obtained after Juiliano's arrest. The record fully supports these findings. Juiliano presented no evidence that if counsel had filed a motion to quash the arrest warrant, the court would have granted it, or that the outcome would have been different if any evidence had been suppressed. Because the Kansas Court of Appeals correctly applied federal law, federal habeas relief is not warranted.

C.     "Good Character" Evidence

Juiliano contends that trial counsel provided ineffective assistance when he failed to object to admission of "good character" evidence of the victim. Juiliano first raised this issue in his state habeas petition. The Kansas Court of Appeals agreed that evidence of the victim's character had been improperly introduced and that counsel should have objected. Id. at *2. The court did not believe that the character testimony made a difference in the outcome of the trial because the testimony constituted only a small part

of the evidence presented.  Id.

Again, the record supports this finding.  Testimony by Charley Chaney supported the solicitation charge.  Even disregarding the character evidence, the jury verdict on the murder charge was supported by evidence of Juiliano's anguish over the relationship between Jardon and West, his purchase and possession of the murder weapon, his desire to kill the victim, and the presence of the murder weapon and shell casings on his property.  The record supports the findings of the Kansas Court of Appeals that counsel's failure to object to evidence of the victim's good character did not prejudice Juiliano.  Juiliano has presented no evidence to the contrary.  The Court therefore denies relief on this claim.

### D.      Prosecutorial Misconduct

Finally, Juiliano argues ineffective assistance because trial counsel failed to object to prosecutorial misconduct at trial and appellate counsel failed to appeal the issue of prosecutorial misconduct. Specifically, he argues that the prosecutor improperly (1) referred to him as a stalker, killer and liar; (2) stated that defense counsel had "blown a lot of smoke;" and (3) told the jury "don't let him get away with this."  Juiliano first raised this issue in his state habeas petition.  The Kansas Court of Appeals affirmed the district court denial of relief.  The court applied a two-step analysis to the allegation of prosecutorial misconduct: (1) whether the prosecutor's comments fell outside the wide latitude for language and manner that a prosecutor is allowed when discussing evidence; and (2) whether the prosecutor's statements so prejudiced the jury that defendant was denied a fair trial.  Id. (citing State v. Davis, 275 Kan. 107, 121, 61 P.3d 701 (2003)).  Under the second step, the court considered (1) whether the comments showed ill will on the prosecutor's part; (2) whether the evidence against defendant was so overwhelming that any misconduct carried little weight in the minds of the jury; and (3) whether the trial court sanctioned the

comment.  Id.

The Kansas Court of Appeals found that the prosecutor's statements that Juiliano stalked the victim were supported by evidence.  The court found that the prosecutor had committed misconduct by calling Juiliano a killer and a liar but that these comments did not amount to reversible error.[5]  The court also found that the prosecutor's admonition "don't let him get away with this" and accusation that defense counsel had "blown a lot of smoke" were not prejudicial.  The court further concluded that the cumulative errors did not deny Juiliano a fair trial, noting that "[a] defendant in a criminal case is entitled to a fair trial, not a perfect one."  Id. (citing State v. Johnson-Howell, 255 Kan. 928, 952, 881 P.2d 1288 (1994)).

Again, the Kansas Court of Appeals applied the proper federal legal standards.  Juiliano offers no evidence that counsel's failure to object to prosecutorial misconduct denied him a fair trial.  Failure of appellate counsel to raise this issue would not have altered the outcome because the Kansas Court of Appeals found no reversible error.  The Court therefore denies Juiliano's petition.

**IT IS THEREFORE ORDERED** that Juiliano's habeas petition be and hereby is **DENIED.**

Dated this 25th day of January, 2005 at Kansas City, Kansas.

s/ Kathryn H. Vratil
Kathryn H. Vratil
United States District Judge

---

[5]     The State notes that in reaching its decision, the Kansas Court of Appeals relied on cases decided after State v. Pabst, 268 Kan. 501, 996 P.2d 321 (Kan. 2000).  Prior to Pabst, claims of prosecutorial misconduct almost always failed.  The Kansas Court of Appeals' reliance on more recent cases results in a more stringent application of the standard than that which prevailed at the time of Juiliano's trial.  The State points out that even applying a higher standard, the Kansas Court of Appeals did not find that the misconduct resulted in an unfair trial.

14